No. 39,148

STATE OF KANSAS, on the Relation of HAROLD R. FATZER, Attorney General, *Plaintiff*, v. ZALE JEWELRY COMPANY OF WICHITA, INC., a Corporation, *Defendant*.

(298 P. 2d 283)

Opinion filed June 9, 1956.

*Glenn J. Shanahan*, of Wichita, special assistant attorney general, argued the cause and *Harold R. Fatzer*, attorney general, *Wendell L. Garlinghouse*, of Topeka, special assistant attorney general, and *Dale M. Bryant*, of Wichita, special assistant attorney general, were with him on the briefs for the plaintiff.

*Dale M. Stucky*, of Wichita, argued the cause and *Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt*, and *Theodore C. Geisert*, all of Wichita, were with him on the briefs for the defendant.

The opinion of the court was delivered by

SMITH, C. J.: This is an original action in quo warranto brought by the state on the relation of the attorney general wherein the state asks that the defendant corporation be ousted from engaging in the practice of optometry. Plaintiff also asks that the charter of the corporation be forfeited and a receiver appointed. Our commissioner found in favor of the defendant. The state asks us to read the record and make findings of fact and conclusions of law in its favor. The cause has been submitted on the merits.

The petition alleged that Zale was a corporation and had forfeited its corporate rights by practicing optometry in the state within the meaning of G. S. 1949, 65-1501 and 65-1502; that it had never been licensed to so practice optometry; that it had further violated G. S. 1949, 65-1510, relating to optometry, by unlawful acts set out.

The petition further alleged that unless the defendant corporation should be ousted from unlawfully exercising the right and

privilege to practice optometry it would continue to so engage; that the acts described amounted to a forfeiture of its corporate rights.

The prayer was that it be ousted from practicing optometry and it should be dissolved and a receiver appointed to close out its business, and for costs.

Defendant's motion to dismiss was denied.

The defendant answered first that the petition did not state facts sufficient to constitute a cause of action; second, that the extraordinary remedy of quo warranto would not lie since there were other adequate remedies at law or in equity; third, it denied the allegations in the petition which were in any way inconsistent with the allegations of the answer; fourth, that defendant admitted its existence; fifth, admitted it never had been licensed to practice optometry; sixth defendant denied any and all allegations of the petition which were intended to allege that Marks or Carp had been employed by, were agents for, or partners of the defendant and denied that defendant had held them out as such and denied that Marks or Carp operated their businesses under any authority from defendant. Defendant alleged it leased space to Marks and Carp; that none of its activities were within either the letter or the spirit of the optometry law and that if the law should be construed as such it would be unconstitutional for reasons set out.

The answer prayed that plaintiff take nothing by this action. The reply of the state was a general denial.

We appointed a commissioner who proceeded to hear and receive evidence. He made findings of fact and conclusions of law.

There were many facts about which there was no dispute. The question actually is what conclusion should be reached as to the ultimate facts.

The commissioner found that Zale operated its business in a building at the rear of which was an enclosed balcony; that it used its first floor for its jewelry business; that on April 1, 1952, it rented Marks, who was a Kansas licensed optometrist, space on the balcony for $100 a month; it agreed to handle his accounts receivable, including his collections, and to do his bookkeeping. Marks also agreed not to engage in any business in competition with that of Zale, and that his business should be confined to the examination and refraction of eyes, the prescription of lenses and visual

training to correct defects of eyes. He agreed not to engage in the sale of lenses or glasses; his accounts were handled by Zale until the arrangement was terminated; that on April 1, 1952, Zale leased Carp doing business as the Douglas Optical Company the space for a term of three years at a rental per month of 20 percent of his monthly gross sales. It also agreed to handle his accounts receivable, including his bookkeeping, clerical work and other services and he agreed not to engage in any business in competition with that of the lessor; that the Douglas Optical Company engaged only in the business of manufacture of lenses, ground to prescription furnished by those qualified and licensed to make such prescriptions and did not engage in the practice of optometry. The commissioner found it operated solely within a field of business endeavor not regulated by law; that defendant, Marks and the Douglas Optical Company each expected that each would benefit financially from their respective locations in proximity to each other; that this was a proper consideration but neither Marks nor the Douglas Optical Company were employees of defendant; it did not benefit directly in or have any right to any part of fees charged by Marks for his professional services; did not exercise direction or control over Marks or over the time or manner, when or how he practiced optometry; that the mere fact of the location of his office within the building in which defendant conducted its business was of no legal significance.

The commissioner found that much testimony was received as to definition of such terms as optometrist, optician, refractionist, ophthalmologist, dispenser and the field and scope of operation, work and service performed and done by each but that these differences were not involved in the issues raised by the pleadings; that at the time defendant began business it had a sign placed over the entrance to its place of business with the legend "Zale's Jewelers" placed thereon and permitted Douglas Optical Company to attach to its sign a sign of its own carrying its name "Douglas Optical Company"; that in connection with the name of Douglas Optical a neon outline of frames of eye glasses was included with an accompanying legend "Glasses Fitted." In April or May, 1953, at the suggestion of defendant Douglas Optical removed the outline of the frames of eye glasses and the legend "Glasses Fitted," retaining only on its sign the words "Douglas Optical Company"; these signs referring to the optical business and to Douglas Optical

were the property of Douglas Optical; that the change in the signs was made by Douglas Optical at its own expense; the sign was so designed that it could be removed, detached and changed without damage to defendant's sign; that beneath the sign of Douglas was a window in which defendant permitted Douglas to have a display of frames for eye glasses; that the display included at least on occasion a placard carrying the legend "We Have The Finest Quality Glasses. Lowest Prices. Easiest Credit"; that this display was changed from time to time by employees of Douglas; that the entrance to the balcony in Zale's building was on the first floor at the rear of Zale's sale floor; that it was not possible to see any of the merchandise or employees of Douglas Optical or the office of Marks from the sales floor; that there appeared over the entrance to the balcony a sign erected by Douglas Optical Company carrying the legend "Optical Dept."; that the sign was not the sign of Zale; the word "Dept." as used therein, had a place connotation to the public, and obviously had reference to the optical department of Douglas Optical Company; that Douglas Optical was not a department of defendant and was never so held by it; that at the suggestion of defendant in May, 1953, Douglas changed the sign to read "Douglas Optical"; that in April, 1952, Douglas prepared, published and paid for certain advertisements in the Wichita *Beacon* and Wichita *Eagle* which were introduced in evidence; that each advertisement carried the name "Douglas Optical" upon it and described Douglas Optical as "Dispensing Opticians"; that during the first ten days said ads were published and there was reference made to eye care and to the fitting of glasses; that no reference was made after April 20, 1952, a year prior to filing this action; that the ads referred only to glasses or eye wear, advertising savings on glasses and emphasized easy credit terms; that after August 1, 1952, the ads quoted prices for glasses; that almost universally the ads stated to the effect "we can fill your doctor's or optometrist's prescriptions exactly as prescribed . . ."; that the name "Zale" was placed on the ads by the Douglas Optical only in connection with and immediately adjacent to the address of defendant's building at 318 East Douglas; that on April 22, 1952, the words "offices at" were inserted before Zale's name and its address and even earlier the words "located at" were used in connection with Zale's name. The words "offices at" were omitted by Douglas Optical in some of the ads, but at all times the name of

Zale appeared only as a place of identification of Douglas Optical whose name was clearly stated; that no ad complained of appeared after March 6, 1953, more than a month prior to the filing of this action; that defendant did not authorize, prepare or pay for the ads complained of and was not responsible therefor; that it did run jewelry ads of its own and had an account of its own with the newspapers; that in the beginning the ledger accounts as to the Douglas Optical Company ads, which were maintained by the respective newspapers, did carry the name of "Zale Optical" although they related to that material published by Douglas Optical.

The conclusions of law were as follows:

"1. The Kansas Optometry Act does not dictate where a licensed optometrist must have his office, nor does it prohibit the location of his office at or in any place. He may, therefore, locate his office anywhere that he concludes would be practicable and advantageous from personal, professional and economic considerations.

"2. The Kansas Optometry Act does not prohibit contractual business arrangements by an optometrist with anyone with reference to the handling and servicing of the accounts of the optometrist for his professional services.

"3. The lease arrangement between Zale and Dr. Marks and the operations thereunder were lawful and did not constitute the practice of optometry.

"4. The lease arrangement between Zale and Douglas Optical and the operations thereunder were lawful and did not constitute the practice of optometry.

"5. Neither Dr. Marks or Douglas Optical violated the laws relating to the practice of optometry. In any event, none of the specific alleged violations of G. S. 1949, 65-1501, 65-1502, 65-1504a, and 65-1510, complained of, if they existed, are legally attributal to Zale.

"6. Zale has at no time been engaged in the practice of optometry, nor has it advertised or held itself out with any other person or persons that it maintained an optometric office or could furnish optometrical services.

"7. Plaintiff has not established a right to relief by a preponderance of the evidence, judgment should be entered denying the relief prayed for, and Zale should have judgment for its cost."

Plaintiff filed exceptions to the report and moved that we adopt substitute findings of fact and conclusions of law favorable to it. The defendant filed its motion asking us to confirm the report. Final submission was on those two motions.

The report of our commissioner is advisory only. When the commissioner's findings of fact are questioned we examine the entire record and make our own findings and conclusions. (See *State, ex rel., v. Foley,* 107 Kan. 608, 193 Pac. 361.)

There is little dispute in this record about the basic facts. Much of it is a matter of publicity in the advertising columns of the news-

papers of Wichita. No attempt was made by defendant to conceal other facts bearing on the manner in which defendant carried on its business. Our problem is what final conclusion to draw from the undisputed facts. The factual issues may be proved by circumstantial evidence. (See *Balthazor v. B & B Boiler & Supply Co.,* 169 Kan. 188, 217 P. 2d 906.) A finding of fact may rest upon reasonable inferences and presumptions to be drawn from all the surrounding facts and circumstances. It need not rise to that degree of certainty which will exclude every reasonable conclusion. A jury and a court have a right to believe circumstantial evidence, and to disbelieve direct evidence. (See *Brothers v. Adams,* 152 Kan. 675, 107 P. 2d 757.)

In the first place, the state charged the defendant was practicing optometry at its place of business, which it was not licensed to do, and which a corporation could not be licensed to do. (See *State, ex rel., v. Goldman Jewelry Co.,* 142 Kan. 881, 51 P. 2d 995.) The petition alleged an arrangement with one Marks, a licensed optometrist, and one Carp doing business as the Douglas Optical Company.

The answer was a general denial and also raised some constitutional questions, with which we are not now concerned. The section of our statute with which we are chiefly concerned is G. S. 1949, 65-1502. The section reads in part:

"That any person shall be deemed to be practicing optometry within the meaning of this act, who shall in any manner . . . *first,* display any sign, circular, advertisement or device purporting or offering to in any manner examine eyes, test eyes, fit glasses, or setting himself or herself forth as an optometrist, optician, specialist, eyesight specialist, or refractionist, with intent to induce people to patronize himself, herself or any other person; . . . *third,* who shall in any manner adapt lenses to the human eye for any purpose, either directly or indirectly."

What are the facts and circumstances we must consider? The defendant is a domestic corporation with its stock all owned by a Texas corporation. It is engaged in the main in the retail jewelry business. In Wichita it operates a jewelry store in a two-story store building. Its jewelry business is transacted on the ground floor. The second story is used for storage purposes. In the rear of the first floor is a balcony reached by stairs from the floor. On this balcony Dr. Marks and The Douglas Optical Company carried on their activities. Each had a lease with defendant, both leases executed on April 1, 1952. Dr. Marks rented a room about 8 by 20 feet for a refracting room and a room adjoining for a waiting room.

The rent was $100 a month. Defendant agreed to service and handle the accounts receivable of Marks, including his collections, bookkeeping and clerical work. Marks agreed not to engage in any business in competition with defendant. Douglas Optical leased the entire balcony except what was leased to Marks. It agreed to pay defendant 20 percent of its gross sales to be paid on the 10th of every month. Defendant agreed to service and handle at its own expense the accounts receivable of Douglas, including collections, bookkeeping and clerical work. It should be pointed out here that the business of Marks, the optometrist, was to test eyes and to ascertain what glasses, if any, the patient needed. That of the optical company was to grind the lenses according to the optometrist's prescription and to furnish frames for the lenses. The lenses were all ground in Dallas, Texas.

In the early stages of the case there was in the rear corner of defendant's store near the stairway to the balcony a neon sign reading "Optical Dept." After this action was commenced this was changed to "Douglas Optical."

There is no dispute about how business was carried on. When a customer entered the store a clerk would ask what he wanted. When he answered he had come to get some glasses he was directed to the stairs at the back of the optical department. On arriving at the balcony he would be met by a young lady who would ask him some questions. Dr. Marks then proceeded to examine his eyes. A prescription by Marks was then handed to the optical company. He was shown frames, informed of the price of glasses and made arrangements how he wanted to pay, whether cash or in payments. The fact is the glasses could be paid for in payments. The customer would be taken downstairs then to defendant's cashier, where credit arrangements on payments were made. Payments were made to defendant's cashier and correspondence as to delinquent accounts was on defendant's stationery.

In the front of defendant's store are display windows. One is devoted exclusively to the display and advertising of eye glasses. Above the front of the store is a large projecting neon sign bearing the words "ZALE's JEWELERS." Below these words appeared the replica of a pair of glasses and the words "GLASSES FITTED." After this action was commenced the replica of the pair of glasses was removed and the words "GLASSES FITTED" were omitted. There were no signs in the window or on the balcony that made any

reference to Dr. Marks or Douglas Optical except the sign on the stairs that was changed from "Optical Dept." to "Douglas Optical" after this action was begun.

Defendant carried on an extensive advertising campaign in the local newspapers. These were usually rather large display ads. They would devote considerable space to the jewelry business of defendant but always a portion would be devoted to the optical business. For instance, in the issue of the Wichita *Eagle* for Thursday morning, April 10, 1952, appears a large ad with the sign of "ZALE'S JEWELERS" in big letters. The ad reads also:

"A NEW service for you—NOW - - - located right in our store you will find complete new optical dispensing offices."

This ad also stated:

"You can add your optical purchase to your regular Zale's account."

Above the large sign of "ZALE'S JEWELERS" and in small print appeared the words "Douglas Optical" and "Dispensing Opticians."

In the issue of the Wichita *Eagle* for Saturday morning, April 12, 1952, appeared an ad containing the sign of "ZALE'S JEWELERS" in large print. Among other things this ad stated:

"You save from $50 to $20 on eye care."

The record contained exhibits, many like advertisements from both the Wichita *Eagle* and the Wichita *Beacon*. At first these ads were all charged to defendant's account. Later they were charged to Douglas Optical.

A corporation can act only through its agents or employees. Since it is clear that Dr. Marks is practicing optometry our inquiry is narrowed to the question whether Marks is an agent or employee of defendant. If he is, we must find as a matter of fact that defendant is practicing optometry. Our commissioner found that neither Dr. Marks nor Douglas Optical was an employee of Zale. There was testimony that Zale had no control over either Marks or Douglas Optical and that neither the defendant corporation or the parent corporation had ever employed him. We may believe circumstantial evidence and disbelieve direct evidence. (See *Brothers v. Adams*, 152 Kan. 675, 107 P. 2d 757.) In the consideration of the entire record it is our duty to draw our own inferences and indulge our own presumption and to draw our own conclusions from the proven facts as long as they are reasonable inferences, presumptions and conclusions. Defendant relies in the main on the two leases

already mentioned to establish that the relationship between it and Marks and it and Douglas was strictly that of lessor and lessee. Our commissioner adopted that view. There are some features of the two leases, however, that cause us to be a little skeptical of that view. The two leases were entered into the same day. They each had the provision about defendant handling the business and financial affairs of both Marks and Douglas Optical. A reasonable inference is that such provision was in the lease so as to permit defendant to exercise control over both.

*Rowe v. Standard Drug Co.,* 132 Ohio St. 629, 9 N. E. 2d 609, was a case where a drug company was charged with contempt for violating an injunction, enjoining it from practicing optometry. The arrangement between the drug company was somewhat analogous to what we have here. The drug company relied on leases between it and an optical company to establish the relationship of lessor and lessee. The court said:

"The court, however, is not limited by the terms of the lease but will consider the manner in which the optical business was conducted and the extent to which the corporation participated in transactions involving optometrists."

. . . . . . . . . . . . .

"Of course a lease, valid on its face, may be a mere sham or devise to cover up the real transaction; but such a subterfuge will not be permitted to become a cloak for illegal practices. The courts will always pierce the veil to discover the real relationship. Where a corporation directly or indirectly engages in the practice of optometry the lease will afford no protection on a proper challenge of the illegality."

So here we will attempt to pierce the veil of the apparent to find if we can discover what is the actual situation considering all the surrounding facts and circumstances.

*Ritholz v. Ark. State Board of Optometry,* 206 Ark. 671, 177 S. W. 2d 410, was a case where a company had hired an optometrist. Later the arrangement had been to lease space to him in the store. The arrangement was not unlike the one we have here. The court found the lease arrangement was collusive, "A fiction for the agency that exists between the parties."

In practically every authority we have examined on the question the courts have been compelled to examine and consider a course of dealing such as we have here. They have universally held that a lease arrangement such as these parties entered into was a subterfuge. (See *State, ex rel., v. Natl. Optical Stores Co.,* 189 Tenn. 433, 225 S. W. 2d 263, 267; *Ritholz v. Ark. State Board of Optometry,*

supra; *Neill, et al., Aplnts., v. Gimbel Bros., Inc.,* 330 Pa. 213, 199 A. 178; *State v. Kindy Optical Co.,* 216 Iowa 1157, 248 N. W. 332; *Ritholz v. Commonwealth,* 184 Va. 339, 35 S. E. 2d 210; *Sears, Roebuck v. Board of Optometry,* 213 Miss. 710, 57 So. 2d 726; and *Lieberman v. Board of Examiners in Optometry,* 130 Conn. 344, 34 A. 2d 213, 216.)

Besides the feature of the leases, to which we have referred, there is the fact at first the neon sign near the stairway to the balcony read until this action was commenced "Optical Dept." A remarkable inference is that the business on the balcony was a part of the business of defendant. Even though it be held to refer to Douglas Optical and not Dr. Marks, still without Dr. Marks, the optical business would not have done well. A further circumstance in the connection is that while the advertisements always spoke of "Douglas Optical" and referred to "dispensing opticians" and never used Mark's name, the ad always carried the legend in small type "No appointment necessary." This is a term commonly used in referring to a visit to an optometrist. A further persuasive circumstance is that all Dr. Marks' prescriptions were filled by Douglas Optical. When glasses were charged, the account was carried in the name of defendant. It serviced and collected for Marks for eye examinations; Dr. Marks told an advertising solicitor who called upon him that he only had a limited amount to spend; he directed the solicitor to how many ads could be run on that amount of money; in a conversation with another optometrist Dr. Marks told him "he had seen a newspaper advertisement that Zale's was going to run in the papers. The substance of the advertisement referred to by Dr. Marks had price quotations for the sale of eyeglasses. Dr. Marks stated he had told Zale's that he prohibited the advertisement of any prices for the sale of eyeglasses, but that after some Wichita doctors filed a complaint against him he then told Zale's they could advertise prices or anything else they wanted to for the sale of eyeglasses." Dr. Marks told an optometrist who was helping him that he must be there when the store opened and stay until it closed; that on one occasion he would keep the boys in the store because they were busy; after this man left and opened his own office the manager of defendant with Marks called on him and the manager asked why he was not with them any more. He asked him if he had trouble with anybody at the store.

We have examined the record before the commissioner. Perhaps

we have not set down all the facts and circumstances that have caused us to reach the conclusion we have reached as to the facts. Triers of facts very seldom do. At any rate, we find as a matter of fact that the relationship between defendant and Dr. Marks is that of employer and employee. Dr. Marks is practicing optometry. He is employed to do so by defendant—hence defendant is practicing optometry, which it cannot do.

Judgment is in favor of plaintiff ousting defendant from the practice of optometry in the state. Plaintiff asks us to order the dissolution of defendant and the appointment of a receiver to wind it up. We find the record does not warrant such a drastic measure.

FATZER, J., not participating.